UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDELITY BROKERAGE SERVICES LLC,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY HOFFMAN, and<br>J.P. MORGAN SECURITIES LLC,<br><br>Defendants. | Case No. 1:17-cv-02831<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") respectfully moves this Court for the entry of a temporary restraining order ("TRO") (without security) against Defendants Timothy Hoffman ("Hoffman") and J.P. Morgan Securities LLC ("JPMorgan") pursuant to Fed. R. Civ. P. 65. Injunctive relief is necessary to prevent irreparable harm to Fidelity and to maintain the *status quo* pending FINRA arbitration.

This case stems from the unfair competition perpetrated against Fidelity by one of its former employees, Defendant Timothy Hoffman, and his new employer, JPMorgan. As detailed more fully below and in Fidelity's supporting materials, in December 2016, Hoffman left Fidelity and recently began soliciting Fidelity's clients on behalf of JPMorgan using Fidelity's trade secrets and other confidential customer information. Despite Fidelity's efforts to resolve this matter without resorting to litigation, Hoffman has failed to respond. Rather, as Fidelity has discovered, Hoffman continues to solicit Fidelity customers in violation of his employment agreement and state and federal law.

The parties are subject to the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA"). FINRA Rule 13200. Accordingly, concurrently with filing of

1

this Motion for TRO ("Motion"), Fidelity also is filing a Statement of Claim with FINRA seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2). Although the merits of this case will likely be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain immediate injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Once a TRO is issued by this Court, expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the TRO. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which could delay a hearing on the merits for a year or more. Immediate injunctive relief is therefore needed to preserve the *status quo* until an expedited arbitration hearing before FINRA can occur.

## FACTUAL BACKGROUND[1]

Until December 2016, Hoffman served as a Financial Consultant for Fidelity at its Schaumburg investor center, charged with servicing Fidelity clients who have millions of dollars of invested assets at Fidelity (accounting for over 18 percent of the branch's business). In order to perform his role at Fidelity, Hoffman was provided Fidelity's trade secrets and other confidential information including, among other things, Fidelity's customer contact, financial, and account information.[2] Hoffman was also entrusted with Fidelity's goodwill, which—along

---

[1] The relevant facts are set forth in Fidelity's Complaint and the Declarations of Joe Conforti, Robert Schmidt, and Paul Peterson, filed simultaneously herewith, and are incorporated herein by reference.

[2] As detailed in the Complaint and supporting affidavits, Fidelity has invested substantial time and resources developing its confidential customer information, which confers a significant competitive advantage on Fidelity by allowing it to sell effectively to its customer base. Thus, Fidelity takes reasonable measures to protect such information including by, among other things, maintaining the information on password-protected systems, limiting access to such information to employees with a need-to-know, disseminating and enforcing policies regarding the protection of such information, and requiring employees to sign a standard employee agreement containing restrictive covenants designed to protect Fidelity's confidential information. Further, Fidelity complies with federal regulations requiring that sensitive customer information be kept confidential. *See, e.g.*, 15 U.S.C. § 6801(a) (2012); 17 C.F.R. § 248.10 *et seq.* (2017).

with its confidential information—allows Fidelity to enjoy significant, long-term relationships with its customers and contributes a large portion to its business.[3]  As a condition of employment, and in exchange for receiving Fidelity's confidential information, Hoffman executed an employment agreement containing confidentiality and nonsolicitation provisions.

On December 5, 2016, Hoffman left Fidelity and later started working for its competitor, JPMorgan.  Fidelity did not attempt to restrict Hoffman from working for JPMorgan.  Beginning March 2017, however, Fidelity learned that Hoffman was sending letters to Fidelity customers announcing his new position with JPMorgan.  The only way Hoffman could have known the customers' identities and contact information was through Fidelity's trade secret and confidential customer information.  Accordingly, Fidelity sent Hoffman a cease and desist letter on March 21, 2017 requesting that he immediately cease his unlawful conduct and return (and verify the return of) Fidelity's information.  Fidelity's request was met with radio silence by Hoffman.  Approximately one week later, Fidelity received reports that Defendants had further solicited at least one of its clients by having a JPMorgan assistant call the client on an unlisted number and ask him to meet with Hoffman.  Thus, it is clear that Defendants continue to willfully use Fidelity's trade secret confidential information to impermissibly solicit its customers.  Defendants' conduct has irreparably harmed and continues to harm Fidelity, including its customer relationships and confidential information.  Accordingly, through this action, Fidelity seeks immediate injunctive relief.

---

[3] As set forth in the Complaint and supporting affidavits, Fidelity is unique in the retail brokerage field because it does not have its Financial Consultants make "cold calls" to prospective customers. Rather, Fidelity entrusts its employees with current and potential customers who have already expressed interest in or demonstrate a likely need for Fidelity's services.  Accordingly, Fidelity entrusts its Financial Consultants, like Hoffman, with substantial customer goodwill and rely on them to serve as the face of Fidelity to these customers.  Fidelity invests substantial time and resources in developing and maintaining its goodwill, which contributes a large portion of Fidelity's business.

## ARGUMENT

Fidelity is entitled to an immediate TRO to protect Fidelity's confidential and trade secret information from Defendants' unlawful misappropriation under the Federal Defend Trade Secrets Act ("DTSA"), as well as under the Illinois Trade Secrets Act ("ITSA"). Defendants improperly and without regard to the rights of Fidelity and its customers used and continue to use Fidelity's confidential and trade secret customer information that Hoffman misappropriated from Fidelity to target, solicit and attempt to divert Fidelity customers to JPMorgan. Fidelity will be irreparably harmed if its goodwill and trade secret customer information are not protected. In addition, Fidelity is entitled to an immediate TRO because Hoffman is breaching his Employee Agreement with Fidelity. In particular, Hoffman's misconduct violates the nonsolicitation and nondisclosure covenants of his Employee Agreement, which has caused—and will continue to cause—harm to Fidelity. Accordingly, Fidelity seeks a narrowly tailored TRO enjoining Defendants from continuing to engage in wrongful conduct while the parties proceed to a prompt FINRA arbitration.

Illinois courts routinely grant injunctions barring employees from using their former employers' customer information to solicit the customers of their former employers. *See, e.g., Scheffel Fin. Servs., Inc. v. Heil*, 16 N.E.3d 385, 390–91 (Ill. App. Ct. 2014) (affirming preliminary injunction protecting client information in the financial services industry). In addition, the DTSA expressly provides for injunctive relief for either the actual or threatened misappropriation of trade secrets. 18 U.S.C.A. § 1836(b)(3)(A).

Fidelity vigorously seeks to protect its confidential and trade secret information, which Fidelity uses and is related to its services rendered nationwide. While Fidelity has not previously

had to seek injunctive relief in Illinois, since 2003, Fidelity has sought and obtained injunctive relief to protect its confidential and trade secret information in numerous similar cases.[4]

I. **THE STANDARDS FOR GRANTING TEMPORARY INJUNCTIVE RELIEF STRONGLY FAVOR GRANTING FIDELITY RELIEF IN THIS CASE.**

The purpose of a temporary restraining order is "to maintain the status quo until a hearing can be held on an application for a preliminary injunction." *Abbott Labs. v. Andrx Pharm., Inc.*, 2005 WL 1273105, at *1 (N.D. Ill. May 20, 2005) (citing *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 726 (N.D. Ill. 1989)). In particular, this Court has the power under Federal Rule of Civil Procedure 65 to grant injunctive relief to preserve *status quo* pending arbitration and avoid irreparable harm to the moving party. *Am. Food & Vending Corp. v. United Parcel Serv. Oasis Supply Corp.*, 2003 WL 256865, at *3 (N.D. Ill. Jan 31, 2003) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cunningham*, 736 F. Supp. 887, 889–90 (N.D. Ill. 1990)); *see also* Fed. R. Civ. P. 65.

---

[4] Fidelity successfully obtained a TRO to protect Fidelity's confidential and trade secret information and to stop ongoing solicitation of its customers in these instances: *Fidelity Brokerage Servs. LLC v. Nordstrom*, Case No. 17-0594 (E.D. Cal. March 30, 2017); *Fidelity Brokerage Servs. LLC v. Djelassi, et al.*, Case No. 2015-2337-BLS1 (Mass. Super. Ct., Aug. 11, 2015); *Fidelity Brokerage Servs. LLC v. Moore*, Case No. 2015-609-BLS1 (Mass. Super. Ct., Mar. 18, 2015); *Fidelity Brokerage Servs. LLC v. Hudson*, Case No. 4:14-cv-03229 (S.D. Tex., Nov. 18, 2014); *Fidelity Brokerage Servs. LLC v. Busch, et al.*, Case No. 14-10756 (E.D. Mich., Mar. 7, 2014); *Fidelity Brokerage Servs. LLC v. Clemens*, Case No. 2:13-CV-239 (E.D. Tenn., Nov. 4, 2013); *Fidelity Global Brokerage Grp. v. Beatty*, Case No. 652147 (NY Sup. Ct. Dec. 6, 2010); *Fidelity Global Brokerage Grp. v. Gray*, Case No. 10-1255 (E.D. Va. Nov. 9, 2010); *Fidelity Brokerage Servs. LLC v. Wilder*, Case No. 11-3729 (Mass. Super. Ct. Oct. 25, 2011); *Fidelity Brokerage Servs. LLC v. Fassenfeld*, Case No. 013945/11 (NY Sup. Ct. Sept. 28, 2011); *Fidelity Brokerage Servs. LLC v. McNamara*, No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011); *Fidelity Brokerage Servs. LLC v. Franz*, Case No. 8/9564 (NY Sup. Ct. May 7, 2008); *Fidelity Brokerage Servs. LLC v. Downey*, Case No. 08-1637 (JFB) (E.D.N.Y. April 28, 2008); *Fidelity Brokerage Servs. LLC v. Sanchez*, Case No. 08-03863 (C.D. Cal. 2008); *Fidelity Brokerage Servs. LLC v. Umstead*, Case No. 07-347 (E.D. Va. 2007); *Fidelity Brokerage Servs. LLC v. Vance*, Case No. 07-1230 (C.D. Cal. 2007); *Fidelity Brokerage Servs. LLC v. Stockwell*, Case No. 05-0455 (Mass. Super. Ct. 2005); *Fidelity Brokerage Servs. LLC v. Rupp*, Case No. 05- 00083 (D.N.H. 2005); *Fidelity Brokerage Servs. LLC v. Jones*, Case. No. 04-3478 (S.D. Tex. 2004); *Fidelity Brokerage Servs. LLC v. Parker*, Case No. 04-1027 (S.D. Cal. 2004); *Fidelity Brokerage Servs. LLC v. Johnson*, Case No. A04-CA-662-SS (W.D. Tex. 2004); *Fidelity Brokerage Servs. LLC v. Rousseaux*, Case No. 03- 01319 (D. Md. 2003); *Fidelity Brokerage Servs. LLC v. Donovan*, Case. No. 03-2286 (Mass Super. Ct. 2003); and *Fidelity Brokerage Servs. LLC v. Alexopoulos*, Case No. 03-5362 (Mass. Super. Ct. 2003).

**A.      Applicable Legal Standard For Injunctive Relief**

A court should grant injunctive relief where the moving party can demonstrate: (1) some likelihood of succeeding on the merits of the case; (2) that it has no adequate remedy at law; and (3) that it may be irreparably injured absent injunctive relief; and (4) public interest favors injunction. *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). The elements are evaluated on a sliding scale, where "the stronger the case on the merits, the less irreparable harm must be shown." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1172 (7th Cir. 1997). Similarly, "[t]he more likely the plaintiff is to win, the less likely need the balance of harms weigh in his favor . . . ." *Coca-Cola*, 719 F. Supp. at 727 (citation omitted). As set forth below, Fidelity satisfies these elements.

**B.      Fidelity Has A Strong Likelihood Of Success On The Merits Of Its Claims**

The Defendants' misappropriation of trade secrets and Hoffman's breach of contract justify entry of a TRO. While each claim is sufficient on its own to support injunctive relief, in combination they are even more compelling.

      **1.      Fidelity Is Entitled To Injunctive Relief Because Defendants Misappropriated Fidelity's Trade Secret Customer Information**

Fidelity is likely to succeed on its claims for misappropriation of trade secrets because Defendants have wrongfully retained or obtained, and are using, Fidelity's trade secret customer information to target and solicit Fidelity's customers.

Under the Illinois Trade Secrets Act ("ITSA"), the Court can enjoin actual or threatened misappropriation of trade secrets. 765 ILCS 1065/3(a). The same is true under the Federal Defend Trade Secrets Act ("DTSA"). 18 U.S.C.A. § 1836(b)(3). Accordingly, Fidelity need not wait until the actual use or disclosure of a trade secret to move for injunctive relief.

A "trade secret" is defined by ITSA as follows:

information, including but not limited to, technical or non-technical data, a
formula, pattern, compilation, program, device, method, technique, drawing,
process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not
being generally known to other persons who can obtain economic value from its
disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to
maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). DTSA's definition of a trade secret is similar. 18 U.S.C. § 1839(3).

"Trade secrets include 'customer lists that are not readily ascertainable. . . .'" *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (quoting *Mintel Int'l Grp., Ltd. v. Neergheen*, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010)). Fidelity's customer information constitutes protectable trade secrets under state and federal law.

ITSA defines "misappropriation" as:

disclosure or use of a trade secret of a person without express or implied consent
by another person who . . . at the time of disclosure or use, knew or had reason to
know that knowledge of the trade secret was . . . acquired under circumstances
giving rise to a duty to maintain its secrecy or limit its use [] or derived from or
through a person who owed a duty to the person seeking relief to maintain its
secrecy or limit its use.

765 ILCS 1065/2(b). DTSA's definition of misappropriation is similar. 18 U.S.C. § 1839(5).

While the names, addresses, and telephone numbers of many Fidelity customers may be publicly available, the fact that they have hundreds of thousands of dollars in investable assets and desire financial services is not. Peterson Decl., ¶ 7. *See Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995) (although customer information was available through "publicly available sources," customer list was a trade secret since it was created over time and efforts by plaintiff).

Based on the evidence adduced at this early stage, it is highly unlikely that Defendants

simply went the Internet and selected a swath of people in a particular area to call or send announcements to. Instead, the evidence demonstrates that Defendants, using information Hoffman had because of his employment with Fidelity,[5] targeted Fidelity customers who Hoffman knew had money to invest and were willing to pay for financial services[6] and, in the case of Joe Conforti, JPMorgan called a Fidelity customer using the customer's unlisted telephone number. Conforti Decl. ¶¶ 2-8. Fidelity's customer information is confidential and was developed over a long period at great expense to Fidelity. Peterson Decl., ¶ 7. Fidelity spends tens of millions of dollars each year growing and managing its customer list. *Id*. at ¶ 4. As explained above, Fidelity instituted effective measures to safeguard the information. *Id*. at ¶¶ 7-9. These steps include maintaining its trade-secret customer data on password-protected computers, providing access to customer information only to those employees whose jobs require access to the customer data, and maintaining confidentiality policies, educating its employees on the policy, and requiring employees, including Hoffman, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity. Further, Fidelity does not provide its trade-secret customer data to competitors, and Fidelity employees are not

---

[5] Whether Hoffman physically took hard copies of Fidelity's confidential information or simply uses information stored in his memory to recreate customer lists is of no consequence. Given that an unscrupulous employee could memorize his employer's information, Illinois protects employers from the misuse of remembered confidential information. *See SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at *6 (N.D. Ill. Aug. 9, 2010) (stating that "an employee who memorizes information constituting a trade secret may [not] take that information to a competing company and use it freely: 'Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into non-confidential information.'"), quoting *Stampede Tool Warehouse, Inc.,* 651 N.E.2d at 216–17.

[6] On March 20, 2017, a Fidelity customer with the initials "HT" contacted Fidelity to say that he received an announcement letter from Hoffman. Schmidt Decl., ¶¶ 12, 18, and Exhibit D attached thereto.

permitted to take with them, use, or disclose any customer information when they leave Fidelity.[7] Peterson Decl. ¶¶ 8, 9.

Despite the steps Fidelity has taken to keep its information confidential, Defendants have used Fidelity's trade secret customer information to solicit Fidelity customers for their own benefit. Accordingly, Fidelity has demonstrated a likelihood of success on its claim for misappropriation of trade secrets under the ITSA and DTSA.

### 2. Fidelity Is Likely To Succeed On Its Claim For Breach of Contract

To prove a breach of contract, a party must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015). As demonstrated below, Hoffman's Employee Agreement contains valid and binding restrictive covenants (nonsolicitation and nondisclosure); he has breached those covenants; and Fidelity has been harmed and will continue to be harmed by his conduct.

### a. Hoffman's Nonsolicitation Restriction Serves Legitimate Business Interests, Is Reasonable In Duration And Scope, And Is Fully Enforceable Under Illinois Law

In Illinois, a noncompete or nonsolicitation covenant "will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). A restrictive covenant will be found reasonable "if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-

---

[7] The value of the information to competitors is also clear. The total assets under management of the accounts for which Hoffman was responsible at Fidelity exceeded $300 million – representing approximately 18% of the total assets under management at the entire Schaumburg Investor Center. Schmidt Decl., ¶ 5. Fidelity derives tremendous economic value from the fact that such information is not available to its competitors. Peterson Decl. ¶¶ 8, 9. To permit competitors such as Defendants unfettered access to this information would give them a significant advantage over Fidelity in that they could utilize the information without having made the necessary investments in compiling it.

9

promisor, and (3) is not injurious to the public . . . Further, the extent of the employer's legitimate business interest may be limited by type of activity, geographical area, and time." *Id.* at 396–97.

### *(i)   Hoffman's Employee Agreement Is Necessary To Protect Fidelity's Legitimate Business Interests*

Illinois recognizes a company's trade secrets, other confidential information, and customer relationships and/or goodwill as legitimate business interests that may be protected through restrictive covenants of the type at issue in this case. *See Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 947 (7th Cir. 1994) ("a covenant not to compete may protect . . . trade secrets, confidential information"); *Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("[t]here is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer.") (citing *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 200 (Ill. App. Ct. 2007) (stating that "[e]vidence of confidentiality of information establishes [plaintiff] had a legitimate business interest to protect, *i.e.*, it is one type of significant matter supporting enforceability of the restrictive covenants.")); *A-Tech Computer Servs., Inc. v. Soo Hoo*, 627 N.E.2d 21, 26 (Ill. App. Ct. 1993) (explaining that "[a]n employer has a valid interest in protecting its long-standing client relationships against the subterfuge and sabotage of former employees."); *see generally Reliable Fire Equip. Co.*, 965 N.E.2d at 403 ( "[w]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to . . . the employee's acquisition of confidential information through his employment . . . .").

All three interests are implicated here. During his employment with Fidelity, Hoffman was provided with access to Fidelity's trade secrets and other confidential information, including customer names, contact information, and financial information. This information allowed

Hoffman to maintain and develop strong client relationships and provide the kind of customer service that allows Fidelity to successfully compete against other retail financial services firms.

While the protection of trade secrets and confidential information alone warrants the enforcement of Hoffman's Employee Agreement, Hoffman also enjoyed the benefit of substantial customer goodwill belonging to Fidelity, which goodwill has been compromised and is further jeopardized by Hoffman's current solicitation of clients on behalf of himself and JPMorgan. *See, e.g., Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007) (although plaintiff lost only one customer, defendant's "active solicitation of [plaintiff's] customers ha[d] the potential to weaken [plaintiff's] relationships and goodwill with these customers . . . ."). Throughout his tenure with Fidelity, Hoffman had direct and frequent contact with Fidelity clients while providing them with financial services. Thus, Hoffman is well positioned—because of the personal relationships with Fidelity's customers that Fidelity employed him to develop—to divert a substantial number of those clients to him at JPMorgan.

Given that Hoffman is flouting his contractual obligation not to use Fidelity confidential information and not to solicit Fidelity clients (Employee Agreement, ¶¶ 1, 3, 6), Fidelity's need to protect its clients' confidential information and its client relationships is manifest and urgent. This is precisely the type of circumstance against which confidentiality and nonsolicitation agreements are properly designed to protect.

### *(ii)* *The Employee Agreement Is Supported By Valid Consideration*

Hoffman's Employee Agreement is supported by, among other things (including access to Fidelity's trade secrets, confidential information and customer goodwill), the six years that he worked for Fidelity, which includes his continued employment for almost 18 months in his last position at Fidelity after he signed the Employee Agreement. *See*, *e.g.*, *Montel Aetnastak, Inc. v.*

11

*Miessen,* 998 F. Supp. 2d 694, 715 (N.D. Ill. 2014) (finding that, "[i]n Illinois, continued employment for a 'substantial period' is sufficient consideration to support an employment agreement," and that 15 months employment constituted sufficient consideration).

> *(iii)* ***The Duration And Geographical Scope Are Reasonable And Create No Undue Hardship***

Hoffman's nonsolicitation restriction is also reasonable in duration and territorial limits insofar as it lasts for only one year and its geographic reach is curtailed to the extent that the restriction is directly tied to the customers with whom Hoffman worked or about whom he had confidential information. *See Mintel Int'l Grp., Ltd.*, 2010 WL 145786, at *14 (broad geographical scope of restrictive covenants was acceptable when viewed in conjunction with reasonable, one-year restrictive period); *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999) ("Covenants containing no geographic limitation have been upheld as reasonable where the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements.").

Indeed, given that Hoffman's one-year nonsolicitation restriction does not prevent him from pursuing his career with JPMorgan, or any other competitor, the restriction is all the more reasonable and has only a marginal impact on Hoffman—and certainly far less of an adverse impact on Hoffman than a noncompetition agreement would. *Baird & Warner Residential Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1015 (Ill. App. Ct. 2008) (narrowly-tailored nonsolicitation covenant that would not render defendant "unemployable" deemed reasonable).

> *(iv)* ***Enforcement Of Hoffman's Restrictive Covenant Is Consonant With The Public Interest***

Given that Illinois courts recognize and enforce restrictive covenants and that there is

nothing unusual in this case, the public policy of permitting Fidelity to protect itself from unfair competition supports the enforcement of Hoffman's Employee Agreement. *See Automed Techs., Inc. v. Microfil, LLC,* 2006 WL 1647505, at *3 (N.D. Ill. June 7, 2006), *aff'd in part*, 244 F. App'x 354 (Fed. Cir. 2007) ("There is a clear public interest in enforcing valid contracts and in protecting companies' confidential information.").

### b. Hoffman Has Breached His Agreement, Causing Damage To Fidelity

Based on the evidence available to Fidelity at this point, it is clear that after Hoffman resigned from Fidelity, he began reaching out to Fidelity customers and solicited at least one of them (a customer who Defendants called through an unlisted telephone number) to move the client's business to JPMorgan, in breach of Hoffman's nonsolicitation and confidentiality obligations. *See Tomei v. Tomei*, 602 N.E.2d 23, 26 (Ill. App. Ct. 1992) (targeted mailings directed to customers or prospective customers can constitute solicitation). Given this conduct, there can be little doubt that Defendants are in possession of and are using Fidelity's information to contact its customers. Such conduct has caused Fidelity irreparable harm in the form of lost trade secrets, other confidential information, and customer goodwill. Whether Defendants' misuse of Fidelity's goodwill is considered separately, or together with their misuse of Fidelity's trade secrets and confidential information, Hoffman is unfairly competing with Fidelity in breach of the nonsolicitation covenant in his Employee Agreement. For these reasons, there is a strong likelihood of success on the merits of Fidelity's breach of contract claim.

## C. Fidelity Will Suffer Irreparable Harm Absent Entry Of A TRO

This Court has long recognized the inherent inadequacy of legal remedies and the threat of irreparable harm in cases where the destruction of customer goodwill and trade secrets are at issue. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 716 (N.D. Ill. 2009). Here, the injury

caused to Fidelity by Defendants' actions is incalculable. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001) (noting that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations."), quoting *Abbott Labs.,* 971 F.2d at 16. Denial of injunctive relief would also leave Fidelity "vulnerable to the same conduct from other employees." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin*, 1991 WL 83163, *6 (N.D. Ill. May 9, 1991). Because Fidelity faces the threat of irreparable harm, the requested TRO should be granted.

**D.     Injunction Will Not Harm Others, And Public Interest Supports Injunctive Relief**

The benefit of injunctive relief to Fidelity far outweighs any detriment to Defendants. Such relief also serves the public interest. An injunction would protect Fidelity's valuable trade secrets, goodwill, business reputation, and contract rights. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross,* 1998 WL 122780, at *2 (N.D. Ill. Mar. 13, 1998) (without a TRO, plaintiff "will suffer irreparable harm from the disclosure of trade secrets, customer lists, and other information because [plaintiff] may lose clients and suffer loss to its goodwill and business reputation from [defendant's] actions."). In cases where employees breach confidentiality agreements, courts routinely hold that the balance of harm and public interest weigh in favor of the former employer. *See, e.g., Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*, 1997 WL 24737, at *5 (N.D. Ill. Jan. 17, 1997) ("There is no harm to [defendant] by forcing her to comply with the terms of her contract. . . ."). Fidelity is not attempting to prevent Hoffman from working in the industry or Defendants from competing for new accounts. Instead, it asks only that Hoffman be ordered to comply with his contract and for Defendants to refrain from competing unfairly through the unauthorized use of Fidelity's trade secrets.

Enforcing Hoffman's Employee Agreement and issuing an injunction is consistent with public policy and serves the public interest. *See Automed Techs., Inc.*, 2006 WL 1647505, at *3.

14

Further, Illinois' adoption of the ITSA evidences a public policy of strongly protecting employer trade secrets. The requested injunction furthers these public interests, while permitting Hoffman to continue working for his current employer in precisely the same capacity in which he was hired – though without permitting Defendants to unfairly use Fidelity's trade secrets, confidential information, or goodwill. Accordingly, any potential hardship that Defendants might suffer due to enforcement of the Employee Agreement and protection of Fidelity's trade secrets and confidential information is limited and certainly outweighed by the harm that Fidelity will suffer if Defendants' misconduct goes unchecked.

**E.      Injunctive Relief Is Required Before Fidelity Can Obtain An Expedited Arbitration On The Merits Before FINRA**

On this date, Fidelity is filing a Statement of Claim with FINRA seeking to resolve the ultimate merits of this dispute in an expedited arbitration hearing. As stated above, if this Court does not grant the injunction Fidelity requests, which would advance a full hearing on the merits within 15 days, Fidelity will be required to proceed in a standard-track arbitration before FINRA, which would delay a hearing for a year or more. Thus, Fidelity's election to seek injunctive relief from both FINRA and this Court is not only consistent with, but is required under, the FINRA Code of Arbitration Procedure.

## CONCLUSION

For the reasons stated above, Fidelity respectfully requests that this Court grant its Motion for a Temporary Restraining Order pending expedited arbitration in accordance with Rule 13804 of the FINRA Code of Arbitration Procedure.

15

Respectfully submitted,

FIDELITY BROKERAGE SERVICES LLC,

By its attorneys,

*/s/Kenneth J. Vanko*

Kenneth J. Vanko, ARDC No. 6244048
  vanko@ccmlawyer.com
CLINGEN CALLOW & McLEAN, LLC
2300 Cabot Drive, Suite 500
Lisle, Illinois 60532
Phone: (630) 871-2600
Fax: (630) 871-9869

Russell Beck, MA BBO No. 561031
  rbeck@beckreed.com
Stephen D. Riden, MA BBO No. 644451
  sriden@beckreed.com
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665
*Pro Hac Vice Pending*

## **CERTIFICATE OF SERVICE**

   I, Kenneth J. Vanko, an attorney, hereby certify that on April 14, 2017, I caused a copy of the foregoing Memorandum of Law In Support of Motion for Temporary Restraining Order to be filed with the Clerk of the Court using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

                */s/Kenneth J. Vanko*